79 F.3d 516
 In re BLUE DIAMOND COAL COMPANY, Debtor.
BLUE DIAMOND COAL COMPANY, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Donna E. Shalala;
United Mine Workers of America, Combined Benefit Fund,
Michael H. Holland, William Hobgood, Marty D. Hudson, Thomas
O.S. Rand, Elliott A. Segal, Carlton R. Sickles, and Gail R.
Wilensky, Trustees, Defendants-Appellees.
 No. 94-6539.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 8, 1995.
Decided March 21, 1996.
Rehearing and Suggestion for Rehearing En Banc Denied June 28, 1996.
 
 On Appeal from the United States District Court for the Eastern District of Tennessee; Thomas Gray Hull, Judge.
 Dan D. Rhea and Lewis R. Hagood (argued and briefed), Arnett, Draper & Hagood, Knoxville, TN, for Plaintiff-Appellant.
 Pamela G. Steele, Asst. U.S. Attorney, Knoxville, TN, Scott R. McIntosh (argued and briefed), Appellate Staff, Brian G. Kennedy, William Kanter, U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Secretary of Health and Human Services.
 Peter Buscemi (argued and briefed), Jami Wintz McKeon, Morgan, Lewis & Bockius, Washington, DC, David W. Allen, UMWA Health & Retirement Funds, Office of the General Counsel, Washington, DC, George W. Morton, Jr., Morton, Thomforde & Morton, Knoxville, TN, Paul A. Green, Beins, Axelrod, Osborne, Mooney & Green, Washington, DC, for United Mine Workers of America, Combined Benefit Fund.
 Before BROWN, SILER and MOORE, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 Plaintiff-Appellant Blue Diamond Coal Company ("Blue Diamond") appeals the district court's order granting summary judgment to Defendants-Appellees Donna E. Shalala, Secretary of Health and Human Services (the "Secretary"), and the Trustees of the United Mine Workers of America Combined Benefit Fund (the "Trustees"). Blue Diamond argues that application of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722 & 30 U.S.C. §§ 1231-1232 (the "Coal Act"), to Blue Diamond violates substantive due process and is an uncompensated taking. For the reasons stated below, we affirm.
 
 
 2
 * The Coal Act is the culmination of a long history of federal involvement in coal industry labor issues. That involvement began in 1946, when a prolonged coal strike occurred. The federal government took over the operation of the nation's coal mines and entered into an agreement with the United Mine Workers of America ("UMWA"). That agreement, called the Krug-Lewis Agreement, included provisions that required coal producers to provide health and pension benefits to their workers. In 1947, after the mines were returned to their owners, a group of coal producers called the Bituminous Coal Operators' Association, Inc. ("BCOA"), entered into the first National Bituminous Coal Wage Agreement ("NBCWA") collective bargaining agreement with the UMWA. Blue Diamond, although it was not a BCOA member, agreed to be bound by the NBCWA. In that agreement and subsequent agreements, the coal producers agreed to contribute a per-ton royalty to a fund, similar to the fund established in the Krug-Lewis Agreement, that would pay health benefits and pensions to miners (the "UMWA Fund"). Health benefits were not vested or guaranteed in these early agreements, and the coal producers were not obligated to the UMWA Fund beyond payment of their assigned royalties. However, the UMWA Fund paid health benefits to miners continuously for more than 30 years.
 
 
 3
 In 1974, the UMWA Fund was restructured in the wake of the passage of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. The UMWA Fund was divided into two funds, the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan (the "1974 Funds"). For the first time, the 1974 NBCWA contained an explicit promise of lifetime health benefits. The 1974 Funds soon became financially unstable, however, due to a combination of factors. First, many coal producers either went out of business or became non-union, and thus ceased contributing to the 1974 Funds. Second, many miners reached retirement age. Third, health care costs continued to increase. In 1989, the UMWA initiated a 10-month strike against the Pittston Coal Company over retiree benefits, which was settled only with federal intervention. After the Pittston strike was settled, the Secretary of Labor appointed the Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission") to study the problems with the 1974 Funds and to propose solutions. The Coal Commission's report was presented to Congress, along with other information, during Congress's deliberations over a legislative solution to the 1974 Funds' problems.
 
 
 4
 To solve the 1974 Funds' problems, Congress enacted the Coal Act in 1992. Congress's stated purpose for enacting the Coal Act was "... to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to retirees." Coal Industry Retiree Health Benefit Act of 1992, Pub.L. No. 102-486, § 19142, 1992 U.S.C.C.A.N. (106 Stat.) 3036, 3037. The Coal Act requires all past coal operator NBCWA signatories to finance the benefits to be paid by the "Combined Fund," which the Coal Act created by consolidating the 1974 Funds. 26 U.S.C. §§ 9701(a)(5), 9702, 9704, 9705. Under the Coal Act, the Secretary must identify retired coal miners and their dependents who were entitled to health care benefits under the 1974 Funds and must assign those beneficiaries to NBCWA signatory coal operators that remain in business on the basis of the operators' contractual obligations under the NBCWAs. 26 U.S.C. § 9706. "Eligible beneficiaries" under the Coal Act are coal industry retirees and their dependents who were eligible to receive, and receiving, benefits from either of the 1974 Funds. 26 U.S.C. § 9703(f). The Secretary first must assign eligible beneficiaries to coal mine operators that most recently employed the beneficiaries for at least two years, and were signatories to 1978 or later NBCWAs. 26 U.S.C. § 9706(a)(1). If no such operator exists for a particular beneficiary, the Secretary must assign the beneficiary to an operator that most recently employed the beneficiary and was a signatory to the 1978 or later NBCWAs. 26 U.S.C. § 9706(a)(2). If no such operator exists for a particular beneficiary, the beneficiary must be assigned to a pre-1978 signatory operator, such as Blue Diamond, that employed the beneficiary for the longest period of time. 26 U.S.C. § 9706(a)(3). For each beneficiary assigned to it, the coal mine operator must pay a premium to the Combined Fund. 26 U.S.C. § 9704(a).
 
 
 5
 The Secretary also must assess each NBCWA signatory operator for that operator's proportional share of "orphan" retirees. 26 U.S.C. § 9704(d). "Orphan" retirees, which the Coal Act refers to as "unassigned beneficiaries," are those eligible beneficiaries who cannot be assigned pursuant to any provision of § 9706(a) because their employers have gone out of business. See 26 U.S.C. §§ 9703(f), 9704(d). Each coal mine operator's share of the liability for orphan retirees is proportional to the number of beneficiaries assigned to that operator under § 9706(a) of the Coal Act. Each operator's "applicable percentage" of beneficiaries is determined by dividing the number of beneficiaries assigned under § 9706(a) to that operator by the total number of beneficiaries assigned to all operators under the Coal Act. U.S.C. § 9704(f)(1). Then, the operator is assessed premiums for a percentage of the orphan retirees that is equal to the operator's "applicable percentage" of assigned beneficiaries. 26 U.S.C. § 9704(d). Finally, the Coal Act contains provisions for transfer to the Combined Fund of surplus funds from the 1950 UMWA Pension Plan and the Abandoned Mine Reclamation Fund to mitigate the operators' liability for orphan retirees. 26 U.S.C. § 9705(a)(3), (b).
 
 
 6
 Blue Diamond, a coal mining company located in Knoxville, Tennessee, is a reorganized debtor under Chapter 11 of the Bankruptcy Code. Blue Diamond has been in the coal mining business for more than 50 years. Until 1964, Blue Diamond employed miners who were members of the UMWA, and the company agreed to be bound by the NBCWA collective bargaining agreements between coal producers and the UMWA. Pursuant to those NBCWAs, Blue Diamond contributed per-ton royalties to the then-existing UMWA Fund. In 1964, Blue Diamond stopped employing union miners and terminated its obligations to the UMWA Fund. Blue Diamond has continued to mine coal since 1964 with non-UMWA miners.
 
 
 7
 The bulk of the 1400 living beneficiaries assigned to Blue Diamond (or their decedents) worked for the company at some point in their careers but retired from other employers. Blue Diamond First Amended Complaint at 7-8, J.A. at 14; Declaration of Donald Pierce at 8, J.A. at 364. Approximately 74 of Blue Diamond's assigned beneficiaries were retired and receiving benefits from the UMWA Fund when Blue Diamond switched to non-union labor in 1964. Id. Blue Diamond alleges that its Coal Act premiums will total $4.9 million in the first year, and that the premiums to be paid over the life of the Act have a present value of $25 million.
 
 
 8
 Blue Diamond sued the Secretary and the Trustees in May 1993, alleging that imposing the liabilities required by the Coal Act on Blue Diamond violated substantive due process and was an uncompensated, and therefore unconstitutional, taking of Blue Diamond's property. The district court granted summary judgment to the Secretary and the Trustees, In re Blue Diamond Coal Co., 174 B.R. 722 (E.D.Tenn.1994), and Blue Diamond timely appealed.
 
 II
 
 9
 This court reviews the district court's grant of summary judgment de novo. Coffey v. Foamex L.P., 2 F.3d 157, 159 (6th Cir.1993). Three circuit courts, including the Sixth Circuit, and several district courts have considered challenges to the constitutionality of various provisions of the Coal Act under the Due Process Clause and the Takings Clause. No court has held that the Coal Act violates substantive due process. In Barrick Gold Exploration, Inc. v. Hudson, 47 F.3d 832 (6th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995), this Court held that the Coal Act's failure to provide the same transition payment and withdrawal liability payment credits to former coal mine operators that were provided to current coal mine operators did not violate substantive due process and did not constitute a taking. In Davon, Inc. v. Shalala, 75 F.3d 1114 (7th Cir.1996), a case nearly identical to the instant one, the Seventh Circuit held that the Coal Act provisions requiring NBCWA signatory operators to pay premiums for assigned and orphan beneficiaries, as applied to pre-1974 signatory coal mine operators, did not violate substantive due process and did not constitute a taking. The Second Circuit upheld the same provisions, as applied to post-1974 signatory coal mine operators, against substantive due process and takings challenges. In re Chateaugay Corp., 53 F.3d 478 (2d Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). The district court in Lindsey Coal Mining Co. v. Shalala, 901 F.Supp. 959 (W.D.Pa.1995), again upheld the same provisions, as applied to a pre-1974 signatory coal mine operator, against substantive due process and takings challenges. See also Holland v. High-Tech Collieries, Inc., 911 F.Supp. 1021 (N.D.W.Va.1996) (Coal Act as applied to post-1974 signatory operators and related companies did not violate due process or constitute a taking). However, one district court has held that the Coal Act effected a taking without compensation. In Unity Real Estate v. Hudson, 889 F.Supp. 818 (W.D.Pa.1995), the district court held that the Coal Act, as applied to a corporate successor to signatory operators, did not violate substantive due process but did effect an uncompensated taking.
 
 III
 
 10
 Blue Diamond argues that the Coal Act violates substantive due process by imposing liability upon Blue Diamond for plan liabilities that were created after Blue Diamond had terminated its relationship with the UMWA Fund. Blue Diamond asserts that no NBCWA that it signed contained an express promise of lifetime health benefits and that only the coal mine operators who signed the 1974 NBCWA or later NBCWAs promised lifetime health benefits. Thus, Blue Diamond argues, it had no part in creating the UMWA members' expectations of lifetime health benefits, and it should not be required to provide funds to fulfill the promises of lifetime health benefits made by the 1974 signatory operators.
 
 
 11
 Legislative acts "adjusting the burdens and benefits of economic life" are presumed constitutional. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The Coal Act is classic economic legislation and therefore is presumed to be constitutional. See Barrick Gold, 47 F.3d at 836-38 (analyzing Coal Act as economic legislation). Plaintiffs challenging an economic statute on substantive due process grounds have the burden of proving that the statute is arbitrary and irrational--that no rational relationship exists between the statute and a legitimate government objective. Usery, 428 U.S. at 15, 96 S.Ct. at 2892; Barrick Gold Exploration, Inc. v. Hudson, 823 F.Supp. 1395, 1401 (S.D.Ohio 1993), aff'd, 47 F.3d 832 (6th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). Indeed, plaintiffs bringing substantive due process challenges to statutes must traverse "unusually inhospitable legal terrain" because the Supreme Court has not invalidated an economic statute on substantive due process grounds since it decided Railroad Retirement Board v. Alton R.R., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468, in 1935. In re Chateaugay Corp., 53 F.3d 478, 487 (2d Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995) (citing numerous cases since Alton in which the Supreme Court has upheld economic legislation). Economic legislation is not unconstitutional under the Due Process Clause "solely because it upsets otherwise settled expectations" or because it "impose[s] a new duty or liability based on past acts." Concrete Pipe & Products Of California, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 637, 113 S.Ct. 2264, 2287, 124 L.Ed.2d 539 (1993). The legislature need not produce "mathematical precision in the fit between justification and means" when enacting economic legislation. Id. at 639, 113 S.Ct. at 2288.
 
 
 12
 The deferential standard of review also applies to retroactive economic legislation. Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 729, 104 S.Ct. 2709, 2717-18, 81 L.Ed.2d 601 (1984). The Supreme Court described the standards of review of retroactive economic legislation as follows:
 
 
 13
 "It does not follow ... that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." (citation omitted) But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.
 
 
 14
 Id. (quoting Usery, 428 U.S. at 16-17, 96 S.Ct. at 2892-93). "Thus, we must independently analyze the retroactive aspects of the Coal Act's financing provisions and determine whether Congress chose rational means to further its legislative purpose." Davon, 75 F.3d at 1123.
 
 
 15
 As applied to Blue Diamond, the Coal Act is very similar to the statute upheld in Concrete Pipe. In Concrete Pipe, the plaintiff was a contributing employer to a multiemployer pension fund. After the plaintiff began contributing to the pension fund, the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub.L. No. 96-364, 1980 U.S.C.C.A.N. (94 Stat.) 1208, was enacted. The MPPAA imposed withdrawal liability upon employers who ceased contributing to the pension fund. Concrete Pipe, 508 U.S. at 635-36, 113 S.Ct. at 2286. The plaintiff then withdrew from the pension fund and argued that the imposition of withdrawal liability upon it violated substantive due process because no withdrawal liability existed when the plaintiff entered into its agreement to fund the pension plan. Id. at 635-38, 113 S.Ct. at 2286-87. The plaintiff also argued that the statute was irrational as applied because the plaintiff company did not contribute to the pension fund long enough for any of its employees to earn vested benefits. Id. at 636-38, 113 S.Ct. at 2287. The court dismissed both arguments, stating that the "retroactivity" of the statute was not irrational, and the fact that the plaintiff had provided its employees with service credits that would lead to eventual vesting contributed to the plan's probable liability and therefore was a rational basis upon which to impose withdrawal liability. Id. at 636-40, 113 S.Ct. at 2287-88.
 
 
 16
 Like the plaintiff in Concrete Pipe, Blue Diamond argues that it is irrational to apply the Coal Act to Blue Diamond because Blue Diamond's employees did not have vested rights in the UMWA Fund while Blue Diamond contributed to the UMWA Fund. However, the UMWA Fund, like the fund at issue in Concrete Pipe, was a multiemployer fund that paid benefits on the basis of service with any union employer. Blue Diamond, like the plaintiff in Concrete Pipe, provided service credits to its union employees that contributed to the fund's eventual liability to those union employees. Therefore, Blue Diamond contributed to the UMWA Fund's liabilities and provided a rational basis for Congress to impose Coal Act liability upon it.
 
 
 17
 Blue Diamond further argues that it was irrational for Congress to impose Coal Act liability upon Blue Diamond because Blue Diamond did not promise its employees that they would receive lifetime health benefits. It is undisputed that the NBCWAs did not contain an explicit promise of lifetime benefits until the 1974 NBCWA agreement. However, several federal courts have found that UMWA members had a legitimate expectation of lifetime benefits before the 1974 NBCWA, based on the various funds' more than 30-year history of continuous payment of benefits and the statements of coal industry officials. Davon, 75 F.3d at 1124-25 ("Congress could rationally have concluded that such participation [in the NBCWA benefit funds] led to a legitimate expectation of lifetime benefits."). See also Templeton Coal, 882 F.Supp. at 825 (describing basis for lifetime benefits expectation). Congress certainly had a rational basis for concluding that all NBCWA signatories and "me-too" operators who agreed to be bound by the NBCWAs, including Blue Diamond, contributed toward the legitimate expectations of the UMWA members. As the Seventh Circuit found in Davon:
 
 
 18
 ... [E]very NBCWA signatory company shared some responsibility in creating a legitimate expectation among miners of lifetime health benefits.... [T]he fact that plaintiffs never contractually agreed to provide lifetime benefits does not rebut the rationality of finding that they contributed to the expectation of lifetime benefits. The Coal Commission and Congress found that the promise of lifetime benefits dates back to the 1940s, even though it is not explicit in any NBCWA until 1974. Even if no such promise was made, every NBCWA contributed to the expectation by creating a continuous mechanism for providing UMWA multiemployer-sponsored health benefit plans.... Plaintiffs were part of this tradition and can rationally be said to have contributed to a reasonable expectation of lifetime health benefits.
 
 
 19
 Davon, 75 F.3d at 1124-25.
 
 
 20
 Even if Blue Diamond did not specifically create the UMWA members' expectations of lifetime coverage or if those expectations were not reasonable, Congress could still impose Coal Act liability on Blue Diamond because of Blue Diamond's direct contributions to the Combined Fund's liability. See United States v. Monsanto Co., 858 F.2d 160, 174 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (joint and several liability for cleanup costs imposed upon waste generators whose waste caused pollution at site did not violate due process). As discussed above, Blue Diamond directly contributed to the Combined Fund's liabilities by providing service credits to its former employees. See Concrete Pipe, 508 U.S. at 636-40, 113 S.Ct. at 2287-88 (imposition of withdrawal liability rational when employer has provided its employees with service credits, even though its employees' benefits were not vested). In light of the deferential standard of review applicable to economic legislation, Congress is not required to choose what a court might find to be the best or fairest system of regulation, nor is Congress required to tailor precisely its means to its desired ends. Concrete Pipe, 508 U.S. at 638-40, 113 S.Ct. at 2288. The fact that Blue Diamond never explicitly promised its employees lifetime benefits and never signed an NBCWA that contained an explicit promise of lifetime benefits is not dispositive, because Congress's power to regulate is not limited by the terms of private contracts. Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 223-24, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) (" 'Contracts, however express, cannot fetter the constitutional authority of Congress.'... If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions.") (quoting Norman v. Baltimore & Ohio R.R., 294 U.S. 240, 307-08, 55 S.Ct. 407, 415-16, 79 L.Ed. 885 (1935)). Moreover, a contractual promise of lifetime benefits is not a "prerequisite" of a congressional finding that a party bears some responsibility for the expectations created by its past conduct. Davon, 75 F.3d at 1125-26.
 
 
 21
 Even if the liability imposed by the Coal Act is considered "retroactive" as argued by Blue Diamond, the Coal Act still withstands substantive due process scrutiny. The Coal Act, as applied to Blue Diamond, is retroactive legislation in the sense that it imposes a new duty of payments to the Combined Fund based on each signatory operator's act of participating in a previous and expired NBCWA. See Davon, 75 F.3d at 1121-22 (finding that Coal Act is retroactive as applied to pre-1974 signatory operator). However, the retroactive aspects of the Coal Act themselves are justified by a rational purpose, and the substantive due process precedents require no more. Gray, 467 U.S. at 730, 104 S.Ct. at 2718. In this case, Blue Diamond's past conduct of providing service credits to its former UMWA employees directly contributed to the Combined Fund's ultimate liabilities by allowing Blue Diamond's former employees to become eligible for benefits from the predecessor funds. Certainly it is rational for Congress to impose a retroactive payment burden on those who directly contributed to the liabilities at issue. See Monsanto, 858 F.2d at 174 (retroactive imposition of liability for cleanup costs upon waste generators did not violate due process).
 
 
 22
 Also, Blue Diamond, like every other coal mine operator who participated in the NBCWAs, profited from the labor of the retired miners that the company once employed. See Davon, 75 F.3d at 1123-24. Thus, Congress rationally could hold Blue Diamond partially responsible for paying health benefits for its former employees and their dependents. The Supreme Court approved a similar rationale for retroactive legislation in Usery. In that case, the Court held that legislation imposing retroactive liability upon coal mine operators for their former employees' black lung disease was "justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor...." Usery, 428 U.S. at 18, 96 S.Ct. at 2893. See also Monsanto, 858 F.2d at 174 (Congress acted rationally in imposing retroactive liability on waste generators who "profited from inexpensive waste disposal methods that may have been technically 'legal' prior to CERCLA's enactment.").
 
 
 23
 The Coal Act's imposition of retroactive liability for orphan retirees likewise passes substantive due process muster. Although Blue Diamond did not profit directly from the orphans' labor, it was rational for Congress to require all NBCWA coal mine operators, who each profited from the retired miners' labor, to share responsibility for the industry-wide problem of orphan retiree benefits. See Davon, 75 F.3d at 1124 ("Given that plaintiffs benefitted from the labor of retired mine workers the same as companies still operating in the coal industry, it was rational for Congress to require all contributing coal companies to share responsibility for 'orphan' beneficiaries."). Blue Diamond and the other NBCWA operators also profited from the labor peace and employee benefits obtained by the existence of the various funds, making it rational for Congress to require all of the NBCWA operators to participate in providing sufficient financing to cover all of the Combined Fund's beneficiaries. All employers who contribute to a multiemployer benefit plan share some responsibility for the plan's liabilities. As the Supreme Court stated in Concrete Pipe:
 
 
 24
 But this argument [that the plaintiff should not have to pay a share of the vested benefits of other companies' employees] simply ignores the nature of multiemployer plans, which ... operate by pooling contributions and liabilities. An employer's contributions are not solely for the benefit of its employees or employees who have worked for it alone.
 
 
 25
 508 U.S. at 637-38, 113 S.Ct. at 2287.
 
 
 26
 Moreover, Congress chose a logical scheme to finance orphan retirees' health benefits by imposing liability in proportion to each operator's number of assigned beneficiaries, and by including provisions to mitigate liability for orphans' benefits. 26 U.S.C. §§ 9704(d); 9705(a)(3), (b). Under these circumstances, Congress's imposition of retroactive liability for orphan retirees' benefits is rational. See Davon, 75 F.3d at 1124-25. Because there is a rational basis for imposing Coal Act liability upon Blue Diamond, the Coal Act as applied to Blue Diamond does not violate substantive due process.
 
 IV
 
 27
 On another constitutional front, Blue Diamond argues that a legislative monetary assessment, such as the Coal Act, that is intended to finance liabilities not created by Blue Diamond, is a "taking" that must be compensated. The Takings Clause of the Fifth Amendment reads in pertinent part, "... nor shall private property be taken for public use, without just compensation." The main purpose of the Takings Clause is " 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 123-24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). The Supreme Court, however, has not established any set formula to review Takings Clause challenges, and has engaged in "essentially ad hoc factual inquiries" to determine whether statutes effect takings. Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659. The Court has identified three factors that have "particular significance" in the takings inquiry:
 
 
 28
 (1) the economic impact of the regulation on the claimant;
 
 
 29
 (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and
 
 
 30
 (3) the character of the governmental action.
 
 
 31
 Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224-225, 106 S.Ct. 1018, 1025-26, 89 L.Ed.2d 166 (1986) (quoting Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659).
 
 
 32
 Connolly involved a Takings Clause challenge to the MPPAA, a statute similar to the Coal Act in that it regulated multiemployer benefit plans by imposing retroactive withdrawal liability. In Connolly, the Court assessed the three factors and held that the MPPAA did not constitute a taking. The severity of the economic impact factor weighed against a taking finding, because the plaintiff's liability was proportionate to the plaintiff's relationship with the pension plan at issue. Connolly, 475 U.S. at 225, 106 S.Ct. at 1026. The interference with reasonable investment-backed expectations factor also weighed against a taking finding because, although the contracts signed by the plaintiff did not include withdrawal liability, the plaintiff voluntarily entered a heavily regulated field and had notice that withdrawal from the fund might trigger additional liabilities. Id. at 226-27, 106 S.Ct. at 1026-27. The nature of the government's action weighed against finding a taking, because the government did not physically invade the plaintiff's assets or permanently appropriate them for its own use. Id. at 225, 106 S.Ct. at 1026.
 
 
 33
 Blue Diamond's Takings Clause challenge to the Coal Act fares no better than did the plaintiff's challenge in Connolly. In this case, the district court found that the economic impact factor favored Blue Diamond, but focused solely on the costs imposed upon Blue Diamond by the Coal Act. The proper question is not, however, merely the size of the company's liability under the Act. The Supreme Court has stated that the proper inquiry under the economic impact prong of the takings inquiry in a multiemployer benefit plan context is whether the plaintiff's liability is proportionate to the plaintiff's experience with the fund at issue. Connolly, 475 U.S. at 225, 106 S.Ct. at 1026. See also Davon, 75 F.3d at 1127 ("The first Connolly factor turns on the question of proportionality."). Blue Diamond's liability under the Coal Act is at least roughly proportional to Blue Diamond's experience with the UMWA Fund. Nearly all of the approximately 1400 living beneficiaries assigned to Blue Diamond either worked for Blue Diamond or were related to someone who worked for Blue Diamond, and Blue Diamond provided service credits to those employees. The beneficiaries assigned to Blue Diamond were assigned to Blue Diamond only after they could not be assigned to a signatory to a more recent NBCWA. And although the Coal Act requires Blue Diamond also to pay a portion of the costs for the orphan retirees, the Coal Act relates Blue Diamond's assessment for orphan retirees to Blue Diamond's experience with the UMWA Fund. See Davon, 75 F.3d at 1127-28 (noting that the Coal Act's assessments for orphan retirees are related to operators' experiences with the fund because they are made in proportion to the number of beneficiaries assigned to each operator).
 
 
 34
 Moreover, the Coal Act contains provisions that moderate the impact of the liability for orphans so that liability more closely approximates the operators' experiences with the UMWA Fund. For example, the Coal Act causes funds remaining in the 1950 UMWA Pension Plan and funds collected under the Abandoned Mine Reclamation Act to be paid to the Combined Fund. 26 U.S.C. § 9705(a)(3), (b). See Davon, 75 F.3d at 1127-28 (noting that the Coal Act mitigates each operator's liability for orphan retirees by transferring funds to the Combined Fund, thus reducing the economic impact on individual operators). See Connolly, 475 U.S. at 225-26, 106 S.Ct. at 1026-27 (noting that mitigating provisions keep employer's liability proportionate to its experience with the plan, and help keep the economic impact of the MPPAA from constituting a taking). These mitigating transfer payments in fact were sufficient to cover the first two years of Blue Diamond's liability to orphan retirees. Declaration of Donald E. Pierce, J.A. at 357; see also Chateaugay, 53 F.3d at 486.
 
 
 35
 Although it is a closer question, the Coal Act as applied to Blue Diamond does not interfere with reasonable investment-backed expectations in a way that weighs in favor of a takings finding. The federal government pervasively regulates the coal mining industry, the UMWA Fund originated from a federal takeover of the nation's coal mines, and federal intervention has been required to settle strikes over benefits issues. Given these circumstances, Blue Diamond cannot argue that it was reasonable for Blue Diamond to believe that Congress would never intervene in the management of the UMWA Fund or its successor funds. See Davon, 75 F.3d at 1128-29 (government involvement in coal industry put coal operators on notice that government might intervene in benefit funds).
 
 
 36
 Moreover, Blue Diamond also participated in the NBCWA system that fostered UMWA members' legitimate expectations of lifetime benefits, as discussed above. Thus, Blue Diamond's expectation that it would not be required to fund lifetime health benefits was not reasonable. See Davon, 75 F.3d at 112930 (pre-1974 signatory operators' participation in NBCWA system made expectation that operators would not be liable for future benefits unreasonable). Blue Diamond argues that it expected Congress to impose the costs of "bailing out" the UMWA Fund upon the general public. Such expectations clearly were unreasonable. As the Second Circuit stated in holding that the Coal Act did not constitute a taking:
 
 
 37
 [W]e reject [plaintiff's] contention that it was reasonable to expect to be held no more accountable than society at large for the health care of its retired coal miners.... In light of the fact that [plaintiff] benefitted enormously from the Wage Agreements, from the labor of its former employees, and from the promise of lifetime health benefits that in part attracted them, any interference wrought by the Coal Act with [plaintiff's] expectations was interference with unreasonable, not reasonable, expectations.
 
 
 38
 Chateaugay, 53 F.3d at 495-96.
 
 
 39
 Finally, the character of the Coal Act is identical to the character of the MPPAA--the Coal Act does not physically invade the plaintiff's assets or permanently appropriate them for the government's own use but instead requires payment to a private benefit fund. See Davon, 75 F.3d at 1129 ("... we find the Coal Act indistinguishable [in character] from the MPPAA sustained in Connolly and Concrete Pipe."); Chateaugay, 53 F.3d at 496 ("the Coal Act entails no physical invasion of property, nor any permanent confiscation of [plaintiff's] assets for governmental use."). Compare Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 164, 101 S.Ct. 446, 452-53, 66 L.Ed.2d 358 (1980) (the Court found a taking where interest earned on interpleader funds deposited with a court was appropriated by the county).
 
 
 40
 Blue Diamond cannot show that the Coal Act had a disproportionate economic impact upon the company. The Coal Act does not appropriate private property for governmental use and does not interfere with any of Blue Diamond's reasonable investment-backed expectations. In sum, none of the significant factors in the Takings Clause inquiry favors Blue Diamond.
 
 V
 
 41
 The Coal Act, as applied to Blue Diamond, is neither a violation of substantive due process nor an unconstitutional taking. Blue Diamond thus cannot meet its heavy burden of proving that the Coal Act as applied to it is unconstitutional, even under the facts as alleged by Blue Diamond. Therefore, the district court's order granting summary judgment to the appellees is AFFIRMED.