**EASTERN ENTERPRISES,**
Plaintiff, Appellant,

v.

**Shirley S. CHATER, Commissioner**
**of Social Security, et al.,**
**Defendants, Appellees.**

No. 96–1947.

United States Court of Appeals,
First Circuit.

Heard Feb. 4, 1997.

Decided April 7, 1997.

John T. Montgomery, with whom David C. Kravitz and Ropes & Gray were on brief, Boston, MA, for appellant.

Sushma Soni, with whom Frank W. Hunger, Assistant Attorney General, Washington, DC, Donald K. Stern, United States Attorney, Boston, MA, and Douglas N. Letter, Attorney, Appellate Staff, Civil Division, Dep't of Justice, were on brief, Washington, DC, for federal appellee.

Peter Buscemi, with whom David Lubitz, Morgan, Lewis & Bockius LLP, John R. Mooney, Elizabeth A. Saindon, Mooney, Green, Baker, Gibson & Saindon, P.C., and David W. Allen, Office of General Counsel, UMWA Health and Retirement Funds, were on brief, Washington, DC, for appellees UMWA Combined Benefit Fund and its Trustees.

Kenneth A. Sweder, with whom Howard M. Brown, Thomas M. Looney, and Stroock & Stroock & Lavan were on brief, Boston, MA, for appellees Peabody Holding Co., Eastern Associated Coal Co., and Coal Properties Corp.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and STAHL, Circuit Judge.

SELYA, Circuit Judge.

In this high-stakes appeal, plaintiff-appellant Eastern Enterprises (Eastern) challenges both the Coal Industry Retiree Health Benefit Act, 26 U.S.C. §§ 9701–22 (1994) (the Coal Act), and the interpretation placed upon it by the Social Security Administration (SSA). Eastern claims that the statute, as synthesized by the agency, distorts Congress' intent, offends principles of substantive due process and equal protection, and works an uncompensated taking of a kind proscribed by the Fifth Amendment.

The administrative law argument is new but lacking in merit. The constitutional arguments are retreads which have taken their lumps from courts of appeals in five other circuits. See Holland v. Keenan Trucking Co., 102 F.3d 736 (4th Cir.1996); Lindsey Coal Mining Co. v. Chater, 90 F.3d 688 (3d Cir.1996); Blue Diamond Coal Co. v. Secretary of HHS (In re Blue Diamond Coal Co.), 79 F.3d 516 (6th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 608 (1997); Davon, Inc. v. Shalala, 75 F.3d 1114 (7th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996); LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478 (2d Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). Although these decisions are not binding upon us, we find them convincing. Consequently, we affirm the district court's entry of summary judgment adverse to Eastern.

## I. DIGGING THE TUNNEL

While coal may or may not be "a portable climate," Ralph Waldo Emerson, The Conduct of Life (1860), the industry has witnessed a series of particularly vitriolic labor disputes over the past half-century. We do not chronicle these disputes in their entirety, but confine ourselves to excavating a few nuggets that are important to a resolution of this appeal.

In 1946, motivated principally by miners' demands for decent health and retirement benefits, the United Mine Workers of Amer-

ica (UMW) called a nationwide strike. To forestall industrial paralysis, President Truman nationalized the coal mines. Following the execution of what came to be known as the Krug–Lewis Agreement, the government relinquished control of the mines. The UMW and the Bituminous Coal Operators' Association (BCOA), a multiemployer group of coal producers, then executed the first National Bituminous Coal Wage Agreement (NBCWA). The 1947 NBCWA specified terms and conditions of employment in the mines and, among other things, extended the Krug–Lewis Agreement by providing a modicum of health and pension benefits to miners.

A new NBCWA, signed in 1950, provided that in exchange for union concessions relative to mechanization of the mines, the BCOA would create a welfare and retirement fund financed by a perton levy on coal mined by signatory coal producers. The 1950 Fund was designed to receive employer contributions and use the funds to provide health benefits to current and retired miners (and, in certain cases, to family members).[1] Several subsequent NBCWAs were signed during the next two decades. None of them altered this basic benefits format.

In 1974, demographic changes and the passage of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, led to a restructuring of the 1950 Fund. In its place, the 1974 NBCWA established four separate multiemployer plans, two covering pension benefits and two dealing with allied benefits. The nonpension entities were the 1950 Benefit Plan, which provided health benefits to coal workers who retired before 1976, and the 1974 Benefit Plan, which covered those who retired on or after January 1, 1976. The 1974 NBCWA explicitly guaranteed lifetime health benefits for enrolled miners. No such express warranty had appeared in any earlier agreement.

In response to continued labor unrest and unresolved concerns over benefits, the 1978 NBCWA incorporated a new provision assuring health care for "orphaned" miners (that

is, miners whose employers had abandoned either the coal industry or the UMW), together with complementary "guaranty" and "evergreen" provisions. The net effect of these changes was to obligate signatory coal producers to redeem the promise of lifetime health benefits even after the current pact expired.

Treating the symptoms rather than the cause has never been a very effective method of curing systemic ills. So here: the very economic factors which prompted the remedial measures inserted into the 1974 and 1978 NBCWAs continued to plague the industry. In particular, the cost of health care rose steeply throughout the 1980s, the number of orphaned miners increased dramatically as more and more employers jumped ship, and superannuation swelled the retired miners' ranks. By 1990, contributions from a shrinking number of coal producers proved insufficient to fund the four benefit plans, and those plans were awash in red ink.

The UMW struck the Pittston Coal Company for nearly 11 months in 1989–90. This work stoppage proved to be the straw that broke the dromedary's back. The Secretary of Labor intervened, brokered a rapprochement, and, as part of the negotiated settlement, set up a commission to study the industry's problems and recommend ways of rejuvenating the benefit plans. The Coal Commission issued its report in late 1990. Congress' response to the commission's suggestions took the form of the Coal Act. The Act folded the 1950 and 1974 Plans into a single UMW-sponsored entity (the Combined Fund) and wove an elaborate tapestry designed to ensure that all retirees who were eligible to receive health benefits from the preexisting Plans would obtain them from the Combined Fund.

The linchpin of the statutory scheme is contained in section 9706 of the Coal Act, which directs the assignment of every eligible beneficiary to a "signatory operator" who is still "in business."[2] The signatory opera-

---

1. Subsequent references herein to health benefits for miners should be taken to include those situations in which spouses, relatives, and dependents also are eligible for benefits.

2. A signatory operator is statutorily defined as "a person which is or was a signatory to a coal wage agreement." 26 U.S.C. § 9701(c)(1). A firm is considered to be "in business" if "such

tor (SO) must then pay premiums to the Combined Fund sufficient to defray the estimated annualized health care costs for that beneficiary, as well as an additional amount (proportionate to the number of initial assignments) earmarked to provide coverage for orphaned retirees. *See* 26 U.S.C. § 9704. The assignment hierarchy is administered under the aegis of the SSA. *See id.* at § 9706(a). The hierarchy is structured along the following lines: a retired miner is assigned first, if possible, to an SO which both signed the 1978 (or any subsequent) NBCWA and also employed him for at least two years more recently than any other SO; if no SO fits that description, the retired miner is assigned to the 1978 (or any subsequent) SO which employed him most recently for any length of time; and if there are still no takers (that is, if the retired miner never worked for a 1978 or subsequent SO which is still in business), he is assigned to that SO of any earlier agreement(s) which employed him for the longest period of time. *See id.* at § 9706(a)(1–3). The assignment formula has a safety valve in that the Act preserves the right of any SO which is assigned a miner to seek contribution from other persons in a separate civil action. *See id.* at § 9706(f)(6).

## II. MINING THE ORE

The appellant mined coal from 1946 through 1965, and, although it thereafter left the industry, it remains in business as defined by the Act. It is a signatory operator, having executed the 1950 NBCWA and some later pacts (but not the 1974, 1978, or any subsequent NBCWA).

Samuel East dug coal for Eastern from 1946 to 1960 and for two other companies from 1960 to 1967. East (who had retired and was eligible to receive benefits under earlier Plans) was never employed by a signatory to the 1978 (or any more recent) NBCWA. Thus, because Eastern was the SO which had employed East for the longest period of time, the SSA assigned him and his

wife to Eastern pursuant to Coal Act § 9706(a)(3).

Displeased by the assignment, Eastern filed suit against the Commissioner of Social Security, the Combined Fund, and the Fund's Trustees. Eastern argued that the Coal Act, as applied to it, crossed the constitutional line at several points. After the denial of Eastern's parallel administrative appeal, in which it argued that Eastern Associated Coal Company (EACC), the wholly-owned subsidiary which took over Eastern's coal operations in 1966 and which was sold to Peabody Holding Company (Peabody) in 1987, should have been assigned responsibility for the Easts, Eastern amended its complaint to allege a violation of the Administrative Procedure Act, 5 U.S.C. § 706 (1994). Eastern also filed an action against Peabody and EACC seeking indemnification for the liability resulting from the East assignment.[3] Ruling on cross-motions for summary judgment in the principal case, the district court found in favor of the defendants. The proceedings in the third-party action have been stayed pending resolution of this appeal.

## III. LIGHTING THE FIRE

■ Eastern asserts that the administrative assignment decision must be overturned as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because section 9706(a) is silent on the question of successor liability, Eastern's thesis runs, the law is ambiguous and the SSA ought to have filled the resultant vacuum in such a way as to have dictated assignment of the Easts to EACC.

■ This novel claim is skillfully presented. Still, innovation is not a certain harbinger of forensic success. The road not taken is oft forsaken for good reason. When agency action is based on the agency's interpretation of a statute entrusted to its care, a reviewing court must undertake a two-step inquiry. *See Chevron U.S.A Inc. v. Natural Re-*

---

person conducts or derives revenue from any business activity, whether or not in the coal industry." *Id.* at § 9701(c)(7).

**3.** It should be noted that the Easts (at least Mrs. East, as Mr. East is now deceased) are a test case. The SSA intends to assign approximately 1400 similarly situated miners and beneficiaries to Eastern.

*sources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. Only if the statute on which the agency bases its action is "silent or ambiguous with respect to the specific issue" must the court inquire "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

In this instance, the first step of the *Chevron* pavane is fully dispositive. Section 9706(a) of the Coal Act unambiguously delineates a classification regime—and that regime, literally applied, requires East's assignment to the appellant as the pre1978 signatory which employed him for the longest interval. Moreover, because section 9706(a)(3) speaks of assignment to *"the* signatory operator" (emphasis supplied) which employed the retiree for the greatest period of time, the section by its very terms cannot produce multiple assignments of a single individual.

■ Eastern's claim that Congress overlooked the possibility of assignment to successors of an SO is unpersuasive. It is a basic principle of statutory construction that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardner,* 513 U.S. 115, 120, 115 S.Ct. 552, 556, 130 L.Ed.2d 462 (1994) (citation omitted). This principle obtains here; at two other points the Coal Act makes explicit reference to successors.[4] Then, too, section 9706(f)(6) provides recourse for those wishing to seek contribution from their successors. We regard this provi-

so as a patent indication that Congress did not intend to deal with the question of successor liability in section 9706(a).

To sum up, reviewing the language and architecture of the Coal Act as a whole—a permissible inquiry in carrying out the first step of a *Chevron* analysis, *see K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988)—we think it is obvious that Congress purposely omitted any reference to successors in writing section 9706(a)'s assignment scheme. *See generally Passamaquoddy Tribe v. State of Me.,* 75 F.3d 784, 794 n. 6 (1st Cir.1996) (rejecting idea that statutory silence necessarily indicates ambiguity; in an appropriate context, failure to mention an item demonstrates specific congressional intent). Because the Easts were properly assigned by the SSA in pursuance of the plain terms of the Coal Act, we reject the appellant's administrative law argument.

## IV. STOKING THE FURNACE

■ The appellant next asserts that the Coal Act violates its substantive due process rights. We accord plenary review to this challenge, *see, e.g., United States v. Zorrilla,* 93 F.3d 7, 8 (1st Cir.1996), mindful, however, that statutes which regulate commercial burdens and benefits are clothed in a formidable presumption of constitutionality. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The strength of this presumption is evinced by the fact that the Supreme Court has not invalidated any piece of purely economic legislation on substantive due process grounds in more than 60 years. Given this mountainous topography, Eastern faces an uphill climb.

■ The slope is made steeper—indeed, Sisyphean—because economic legislation, enacted under Congress' Commerce Clause power, is entitled to the most deferential

---

4. In defining a "related person to a signatory operator," 26 U.S.C. § 9701(c)(2)(A) provides that "[a] related person shall also include a successor in interest...." Another provision of the Coal Act states in pertinent part:

If a person becomes a successor of an assigned operator after the enactment date, the assigned

operator may transfer the assignment of an eligible beneficiary ... to such successor, and such successor shall be treated as the assigned operator with respect to such eligible beneficiary for purposes of this chapter.

26 U.S.C. § 9706(b)(2).

level of judicial scrutiny. Where, as here, a piece of legislation is purely economic and does not abridge fundamental rights, a challenger must show that the legislature acted "in an arbitrary and irrational way." *Turner Elkhorn,* 428 U.S. at 15, 96 S.Ct. at 2892. In other words, as long as "the State's objective is legitimate and the taxonomy adopted is rationally related to achieving that objective, then the law does not transgress due process." *Baker v. City of Concord,* 916 F.2d 744, 755 (1st Cir.1990).

■ As if this standard were not generous enough, a reviewing court must uphold the law if any rational basis conceivably exists for it, regardless of whether Congress had that particular basis in mind when it voted passage. *See FCC v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993); *Gilbert v. City of Cambridge,* 932 F.2d 51, 65 (1st Cir.1991). Emphasizing the narrowness of judicial review in this corner of our constitutional jurisprudence, the Supreme Court has declared unhesitatingly that if a statutory scheme is "rational and not arbitrary," Congress has "absolutely no obligation" to choose the version of the scheme that a reviewing court "would find to be the fairest." *National R.R. Passenger Corp. v. Atchison, T. & S.F. Ry.,* 470 U.S. 451, 477, 105 S.Ct. 1441, 1458, 84 L.Ed.2d 432 (1985).

Chary of this forbidding legal landscape, the appellant searches for more hospitable terrain. It implies that because the Coal Act operates retroactively to impose liability on it, the statute should be subjected to some form of heightened judicial scrutiny. This sally pirouettes around a passage from *Turner Elkhorn* in which Justice Marshall wrote: "It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." 428 U.S. at 16–17, 96 S.Ct. at 2893. Carefully considered, the quoted passage cannot carry the cargo that Eastern piles upon it.

■ Legislation is retroactive when it "attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 270, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994). As applied to Eastern, the Coal Act fits within this rubric; past events—the employment of East and the signing of various NBCWAs in the 1950s and 1960s—acquired new legal consequences with the emergence of the new statute. For this reason, other courts of appeals have decided that the Coal Act is retroactive in pertinent part. *See, e.g., Blue Diamond,* 79 F.3d at 523; *Davon,* 75 F.3d at 1122. We agree.

■ Be that as it may, the Court's cases subsequent to *Turner Elkhorn* indicate that a determination of retroactivity does not alter the level of scrutiny that substantive due process analysis demands. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984) (explaining that "the strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively"). Analyzing the quoted passage in *Turner Elkhorn,* the *Gray* Court noted that any due process burden was met "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.* at 730, 104 S.Ct. at 2718. As long as "the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Id.* at 729, 104 S.Ct. at 2717–18. Accordingly, we hold that heightened scrutiny is not warranted simply because the Coal Act operates retroactively and that the conventional standard—the rational basis standard—endures.

■ Rationality review yields a positive result in this case. The historic importance of coal production in the national economy cannot be gainsaid. Moreover, the nexus between labor peace and the due functioning of the mines is obvious. For the last half-century, persistent labor difficulties within the coal industry have threatened the production of a mainstream energy resource.

These difficulties were often sparked by wrangling over the provision of health care benefits for retired mine workers. Viewed against this backdrop, Congress' stated objective—to resolve these problems by ensuring that multiemployer benefit plans were in place and were adequately funded, *see* 26 U.S.C. § 9701 note—was entirely legitimate. Consequently, the Coal Act would seem to survive rationality review.

The appellant does not attack this conclusion frontally, but essays a flanking maneuver. It asserts that the method Congress chose to resolve these incipient problems is itself irrational in that it assigns liability for retired mine workers to companies that did not contribute to the conditions which created the problems (and, hence, the need for a dramatic legislative solution). In mounting this campaign, Eastern emphasizes two related points. First, the pre–1974 NBCWAs—the only ones that Eastern signed—never promised lifetime health benefits to any miners in so many words. Second, Eastern effectively insulated itself from the 1974 and subsequent NBCWAs (which did explicitly promise lifetime benefits); after all, in 1966 it transferred its coal operations to a wholly-owned subsidiary, EACC, and EACC, not Eastern, remained in the coal business, signing NBCWAs and contributing to the more recent benefit plans. Thus, Eastern's reasoning runs, EACC, not Eastern, logically should be made to bear the financial brunt of the miners' plight.

There are two gaping flaws in the fabric of Eastern's analysis. In the first place, it is not accurate to claim that only those SOs which executed NBCWAs in or after 1974 created a legitimate expectation of lifetime health benefits for miners. Congress and the Coal Commission both reviewed the historical evidence and concluded that pre–1974 signatories had made an *implicit* commitment to furnish such benefits. *See Lindsey Coal,* 90 F.3d at 694; *Blue Diamond,* 79 F.3d at 522; *Davon,* 75 F.3d at 1124–25. Since Eastern, as a signatory of the earlier NBCWAs, contributed directly to mine workers' legitimate expectations of lifetime health benefits, requiring it to pay for the realization of those expectations is hardly irrational.

Of course, the appellant is correct in insisting that the commitment distilled by Congress from the historical data was not made explicit in the text of those NBCWAs which were written before 1974. But Eastern reads too much into that omission. To be sure, such an implied commitment might not be enforceable in a civil suit *ex contractu*— but this is a constitutional challenge, not a breach of contract case. For purposes of due process review, Congress' determination that a commitment was made need not rest upon a legally enforceable promise; it is enough that Congress' conclusions as to the existence and effects of such a commitment are rational. *See Lindsey Coal,* 90 F.3d at 694. The conclusions which Congress reached here measure up to this benchmark. They are, moreover, buttressed by circumstantial evidence, especially the substantial concessions that the coal operators exacted from the miners in exchange for the implicit commitment to assure lifetime health benefits. A good example can be found in the 1950 labor pact. That agreement, which Eastern signed, created a welfare and retirement fund in consideration for workers' acquiescence in the automation of the mines. *See Holland,* 102 F.3d at 741.

 Nor does Eastern's inability to anticipate either the precise consequences of its actions or the form those consequences would take have weight in the due process calculus.

> [I]t may be that the liability imposed by the Act … was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

*Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 637, 113 S.Ct. 2264, 2287, 124 L.Ed.2d 539 (1993) (citations omitted). Lack of foresight does not create constitutional infirmity.

The second hole in the appellant's argument is even more ringent. Eastern insists that the Coal Act was a bail-out of the benefit plans, pure and simple; that it did not

contribute to the funding shortfalls which necessitated the bail-out; and, thus, that holding it liable under the Act is bizarre. But this is much too crabbed a view of the historical record. The crisis in retiree benefits occurred in two stages: first, the inculcation of an expectation of lifetime health benefits; and second, the inadequacy of the initial method chosen by the parties (through negotiation, albeit with government intervention) to respond to this expectation. Both elements were necessary in order to forge the problem which Congress eventually addressed. If the expectations had not been created by Eastern and its counterparts, the need for the later plans, and eventually for the Combined Fund, would never have arisen. Thus, it is disingenuous for Eastern to focus solely on its lack of involvement in more recent benefit plans while ignoring its role in the events leading to their establishment.

We add one related note. The persistent theme that permeates the appellant's asseverational array is a professed concern about the fairness of assessing present liability for events concluded three decades ago. Leaving to one side the legal rule which directs us to disregard such concerns, *see National R.R. Passenger Corp.*, 470 U.S. at 477, 105 S.Ct. at 1457–58, it is clear that the statutory scheme actually takes some pains to shield companies like Eastern from disproportionate liability. Eastern and companies like it are third in the hierarchical order of assignment; they will never feel the statutory sting if a 1978 (or more recent) NBCWA signatory which employed a particular miner still exists, or if any other non-defunct company employed the miner for a longer period of time than they did. Moreover, the right of companies like Eastern to seek recompense from companies like EACC is statutorily preserved. Last but not least, for all the protes-

tations of independence which Eastern makes on EACC's behalf, the fact remains that EACC returned tens of millions of dollars in dividends to Eastern during the post–1966 period. Eastern derived substantial financial emoluments from this spin-off, and it now faces financial consequences as well. The net result may not be the tidiest paragon of fairness, but the Constitution offers Eastern no refuge.[5]

The appellant makes a last-ditch argument in support of its substantive due process claim. This argument hinges on the Supreme Court's opinion in *Railroad Retirement Bd. v. Alton R.R.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). But the last six decades have not been kind to *Alton* or to the legal principles upon which the decision rests. *Alton* belongs to an earlier, now discredited doctrinal era, and it is no longer good law.[6] We explain briefly.

A century ago, the Supreme Court indulged a much different outlook on economic legislation, carefully scrutinizing such laws to see if they infringed particular rights, especially the right to contract. *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897), illustrates the Court's approach. In striking down a state statute that effectively rewrote marine insurance on Louisiana property if the issuing company had not fully complied with Louisiana law, the Court expressed its adherence to an expansive rendition of the substantive attributes of the Due Process Clause—a rendition which encompassed not only the individual's right to be free from "physical restraint" but also "to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling ... and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the

---

**5.** In many respects, the system currently in place is more rational than the alternative that Eastern proposes. The appellant would like us to examine only the present day, while the Coal Act bases liability on actions throughout the time frame when miners' expectations were formed. East's case is typical. He was in Eastern's employ during a 14–year period in which he developed a reasonable expectation of lifetime health benefits. In contrast, he never worked for EACC, yet East-

ern's alternative would have that company assume responsibility for him. Requiring Eastern to pick up the tab strikes us as a less arbitrary step.

**6.** We note, moreover, that even if *Alton* were still zoetic, it is readily distinguishable. *See Chateaugay Corp.*, 53 F.3d at 488–89 (distinguishing *Alton* ).

purposes above mentioned." *Id.* at 589, 17 S.Ct. at 431 (dictum).

This philosophy matured into a holding in *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), a case in which the Court nullified a state law limiting the number of hours that a baker could work. The *Lochner* Court made manifest its willingness to strike down, in the name of substantive due process, statutes which restricted "the freedom of master and employé to contract with each other in relation to their employment." *Id.* at 64, 25 S.Ct. at 546. Justice Holmes dissented, assailing the majority's attempt to read its own philosophy into the Constitution and advocating judicial deference to Congress' economic views. *See id.* at 75, 25 S.Ct. at 546–47.

The *Lochner* tide ran strong for a time. *See, e.g., Coppage v. Kansas*, 236 U.S. 1, 14, 35 S.Ct. 240, 243–44, 59 L.Ed. 441 (1915); *Adair v. United States*, 208 U.S. 161, 172–75, 28 S.Ct. 277, 279–81, 52 L.Ed. 436 (1908). *Alton* represents its high water mark. There, the Court invalidated the Railroad Retirement Act, a "New Deal" statute that required railroads to fund a multiemployer retirement plan whose beneficiaries included "those who within one year prior to the date of enactment were in the service of any carrier." *Alton*, 295 U.S. at 345, 55 S.Ct. at 760. The Court's substantive due process analysis focused on the perceived arbitrariness of predicating benefits on a single year of service. *See id.* at 348–49, 55 S.Ct. at 762.

From this point forward, the tide ebbed. Just two years after *Alton*, a resipiscent Supreme Court performed an about-face of nearly 180 degrees. In *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), the Justices upheld a state-sponsored minimum wage law for women and declared unambiguously that "[t]he Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. . . . [R]egulation which is reasonable in

relation to its subject and adopted in the interests of the community is due process." *Id.* at 391, 57 S.Ct. at 581–82. The Court thereafter expressly disclaimed the "*Allgeyer–Lochner–Adair–Coppage* constitutional doctrine." *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 535, 69 S.Ct. 251, 256, 93 L.Ed. 212 (1949).

By the mid–1960s, the Court had embraced Justice Holmes' dissent in *Lochner* and made plain that "[w]hether the legislature takes for its textbook Adam Smith, Herbert Spencer, Lord Keynes, or some other is no concern of ours." *Ferguson v. Skrupa*, 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963). For all intents and purposes, *Lochner* was dead. *See* Laurence H. Tribe, *American Constitutional Law* §§ 8–5 to 8–7 (2d ed.1988); John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 11.4 (5th ed.1995). *Alton* perished with it.[7]

Further exposition, like a delivery of coal to Newcastle, is unnecessary. For the reasons cited, we decline to adhere to *Alton* and hold instead that the Coal Act, as applied to Eastern, does not offend the substantive component of the Due Process Clause. We add only that this holding also sounds the death knell for the appellant's poorly developed equal protection argument. In cases involving rationality review, a court must apply substantially the same analysis to both substantive due process and equal protection challenges. *See Pearson v. Fair*, 935 F.2d 401, 411 n. 18 (1st Cir.1991); *Montalvo–Huertas v. Rivera–Cruz*, 885 F.2d 971, 976 n. 7 (1st Cir.1989). Thus, we reject out of hand Eastern's claim that the Coal Act offends the Equal Protection Clause.

## V. SIFTING THE EMBERS

The appellant's final argument is premised on the Takings Clause of the Fifth Amendment. The Supreme Court has warned that when a due process argument

---

7. To be sure, the Supreme Court has never explicitly overruled *Alton*, but the Court's comments have made clear that the case should be regarded as a dead letter. *See, e.g., Gray*, 467 U.S. at 733, 104 S.Ct. at 2720 (refusing to "resuscitate" *Alton* and leaving little doubt as to its lack

of vitality); *see also* Andrew C. Weiler, Note, *Has Due Process Struck Out? The Judicial Rubberstamping of Retroactive Economic Laws*, 42 Duke L.J. 1069, 1069 n. 5 (1993) (positing that *Turner Elkhorn* actually overruled *Alton* ).

has proven unavailing, "it would be surprising indeed to discover the challenged statute nonetheless violating the Takings Clause." *Concrete Pipe*, 508 U.S. at 641, 113 S.Ct. at 2289 (citation and internal quotation marks omitted). There are no such surprises here.

 The Takings Clause prohibits the confiscation of private property "for public use, without just compensation." U.S. Const. amend. V. The object of this clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Despite these rhetorical flourishes, claims under the Takings Clause must be approached in a practical, commonsense fashion. In particular, given the pervasiveness of the government's regulatory power, it would be foolhardy to assume "that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986).

 A court considering a Takings Clause challenge must undertake a probing, fact-intensive inquiry into the overall circumstances of the case. *See Concrete Pipe*, 508 U.S. at 643, 113 S.Ct. at 2290; *Connolly*, 475 U.S. at 224, 106 S.Ct. at 1026. Although this inquiry is not circumscribed by a predetermined checklist, the *Connolly* Court identified three factors which have "particular significance" in ascertaining the existence *vel non* of a compensable taking. *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026. These factors are (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations, and (3) the nature of the governmental action. *See id.; see also Concrete Pipe*, 508 U.S. at 643–45, 113 S.Ct. at 2290–91. The *Connolly* and *Concrete Pipe* Courts dealt specifically with Takings Clause challenges to the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461 (MPPAA). Because the Coal Act, like the MPPAA, seeks to fund a multiemployer benefit plan

by imposing retroactive liability on employers who withdraw from the plan and/or the industry, we look principally to those cases for guidance.

 We turn first to economic impact. Eastern mines this shaft for all it is worth (and then some), arguing that the assignment provisions of the Coal Act, if not invalidated, will subject it to an ultimate liability of roughly $100 million. Even if this figure is accurate—and the appellees vigorously deny that it is—"mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. at 2291. Because this case does not involve the total deprivation of an asset, the focus of our inquiry into the challenged statute's economic impact must be on proportionality. *See id.* The operative question, then, is whether Eastern's liability is reasonably related to its experience with the benefit plans that eventually blended into the Combined Fund. *See Blue Diamond*, 79 F.3d at 525; *Davon*, 75 F.3d at 1127–28; *Chateaugay Corp.*, 53 F.3d at 494–95. In our opinion, the match reflects a sufficient degree of proportionality.

We believe it is highly significant that the extent of Eastern's statutory liability depends on its links to the provision of health benefits for particular miners. The statutory scheme assigns miners to SOs based on past work experience with a given company. Thus, the scheme saddles a former employer, like Eastern, with liability only for those individuals whom it employed for a relevant (and relatively long) period of time. Furthermore, a firm like Eastern, which has been out of the coal business for over a quarter-century, will be assigned workers only when no post–1977 NBCWA signatory can be found. So viewed, Eastern's liability will be roughly proportionate to the expectation of health benefits that it created and which have been satisfied by the industry since 1950 in a series of multiemployer plans. In situations in which a different former employer either explicitly promised benefits to a particular miner or fostered a greater expectation of benefits than did Eastern (because it employed the miner for a longer period), it will bear the concomitant burden.

And, because the liability for orphaned retirees is based on the number of initial assignments made to an SO, those assignments, too, will be proportional.

The fact that the Coal Act contains provisions which moderate the statutory toll is also probative of a constitutionally tolerable economic impact. *See Connolly*, 475 U.S. at 225–26, 106 S.Ct. at 1026–27. Here, in addition to the provisions already mentioned (which relieve Eastern entirely of liability whenever a company that created a greater expectation of lifetime health benefits for an individual miner can be found), the Coal Act authorizes the use of $210 million from the 1950 Pension Plan, 26 U.S.C. § 9705, and additional moneys from the Abandoned Mine Reclamation Fund, 30 U.S.C. § 1232(h) (1994), to defray the cost of furnishing health benefits to orphaned miners. These measures, together with the contribution proviso contained in Coal Act § 9706(f)(6), support a determination that the Coal Act does not effect a taking. *See Blue Diamond*, 79 F.3d at 525.

The second element of the *Connolly* analysis involves the extent to which the challenged legislation has interfered with reasonable investment-backed expectations. On this point, the appellant's argument that it could not have foreseen the specific form of intervention that a legislative solution would take distorts the proper inquiry. The Supreme Court has not required prescience but instead has dwelled on the level of regulation in a given area or industry, noting that those who conduct business in historically regulated fields "cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. at 2291 (citation omitted).

Since the government appropriated the mines in 1946, federal intervention in, and regulation of, the coal industry has been frequent, and the interventions often have

been triggered by the issue of health benefits for retirees. Eastern cannot reasonably claim ignorance of this pattern of federal involvement, nor can it feign astonishment when a measure like the Coal Act is passed to forestall further labor unrest. Having contributed to the expectation of lifetime health benefits for miners, Eastern had every reason to anticipate that it might be called upon to bear some of the financial burden that this expectation engendered. *See Blue Diamond*, 79 F.3d at 525–26; *Davon*, 75 F.3d at 1128–29; *Chateaugay Corp.*, 53 F.3d at 495–96.

The final element of the *Connolly* triad implicates the nature of the government action. Under applicable precedents, a taking is much more readily found when the government "physically invade[s] or permanently appropriate[s]" assets for its own use than when the claimed deprivation merely "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good." *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026; *accord Keystone Bitum. Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 n. 18, 107 S.Ct. 1232, 1243 n. 18, 94 L.Ed.2d 472 (1987). To present this dichotomy is to resolve it. The Coal Act, like the MPPAA, is merely a public program that readjusts economic burdens, and the funds collected are paid to a private benefit fund, not to a government entity. Consequently, cases such as *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 2893–94, 120 L.Ed.2d 798 (1992), are inapposite. Inasmuch as this factor, like the other two, points toward the Coal Act's constitutionality, there is no basis whatever for the appellant's claim that the statute transgresses the Takings Clause.[8]

## VI. CONCLUSION

We need go no further. Because the SSA assigned the Easts to the appellant in compliance with the clear intent of Congress, ex-

---

8. We are aware that a lone district court has determined, at the preliminary injunction stage, that the Coal Act violated the Takings Clause as applied to a particular operator. *See Unity Real Estate Co. v. Hudson*, 889 F.Supp. 818, 835 (W.D.Pa.1995). But this decision is not persuasively reasoned and its precedential force has been undermined severely by the Third Circuit's summary rejection of a Takings Clause challenge involving the Coal Act. *See Lindsey Coal*, 90 F.3d at 695. Finally, *Unity Real Estate*, on its facts, see 889 F.Supp. at 829–31, is easily distinguishable from the case at bar.

pressed unambiguously in section 9706(a) of the Coal Act, the appellant's administrative law challenge is unavailing. The appellant's constitutional initiatives fare no better. The Coal Act was motivated by a legitimate legislative purpose; the assignment system which it created lies within the wide universe of rational measures that were available to Congress as vehicles for furthering that purpose; and the statutory scheme, as applied, does not impermissibly confiscate Eastern's property.

*Affirmed.*