Michael H. HOLLAND, et al., as Trustees
of the United Mine Workers of America
1992 Benefit Plan, Plaintiffs,

and

United States of America, Department
of Justice, Intervenor,

v.

ROBERT COAL COMPANY,
et al., Defendants.

No. CIV. A. 93–2608(GK).

United States District Court,
District of Columbia.

Nov. 17, 1997.

John R. Mooney, Beins, Axelrod, Osborne, Mooney & Green, P.C., Washington, DC, Peter Buscemi, Dean C. Beryy, Morgan, Lewis & Bockius, Washington, DC, Stacey Michelle Blumer, United Mine Workers of America, Health and Retirement Funds, Office of the General Counsel, Washington, DC, for Plaintiffs.

Deborah J. Andrews, King & Spaulding, Washington, DC, Anthony J. Polito, Polito & Smock, P.C., for Defendant.

### *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiffs Trustees of the United Mine Workers of America 1992 Benefit Plan ("1992 Plan") bring this action to recover premium payments allegedly owed by Defendants to the 1992 Plan under the Coal Industry Retiree Health Benefits Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701, *et seq.* (1989 & Supp. 1997).[1] The Coal Act requires coal operators to contribute to the 1992 Plan to provide health coverage to retired workers.

Defendants contend that the Coal Act does not apply to them or, in the alternative, that it is unconstitutional. (Defs.' Mem. Summ. J. at 10.) They argue that the settlement of a 1988 civil action[2] between Defendants and

---

1. The Coal Act was enacted as sections *19141 to 19143* of the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776, 3036–56. Its primary provisions are codified in the Internal Revenue Code, 26 U.S.C. §§ 9701–9722. For ease of reference, the Court will cite the codifications in the Internal Revenue Code by Code section numbers.

2. *United Mine Workers of America v. Pickands Mather & Co., et al.,* Civil Action No. 84–338 (1988), in the United States District Court for the

the United Mine Workers of America ("UMWA") extinguished their liability to the 1992 Plan.

This matter is before the Court on Parties' Cross–Motions for Summary Judgment [# 36, # 38]. Upon consideration of the Motions, Oppositions, Replies, Memorandum of Intervenor United States in Opposition to Defendants' Motion, the numerous supplemental pleadings filed by the parties, and the entire record herein, for the reasons discussed below, Plaintiffs' Motion for Summary Judgment is hereby **granted,** and Defendants' Motion for Summary Judgment is hereby **denied.**

## I. *Background* [3]

### A. The Coal Act

The Coal Act's history has been well-documented by other courts. *See, e.g., Eastern Enterprises v. Chater,* 110 F.3d 150, 152–154 (1st Cir.1997); *In re Blue Diamond Coal Co.,* 79 F.3d 516, 518–520 (6th Cir.1996); and *In re Chateaugay Corp.,* 53 F.3d 478, 491 (2d Cir.1995). This Court will thus only briefly summarize those facts it deems necessary to an understanding of this case.

Miners have received benefits since 1946 under a series of collective bargaining agreements between UMWA and a group of coal producers, the Bituminous Coal Operators' Association, Inc. ("BCOA"). In these National Bituminous Coal Wage Agreements ("NBCWAs"), the signatory coal producers agreed to contribute to various funds in order to provide miners and their families different types of benefits. Robert Coal Company ("Robert Coal") was a signatory to the 1974, 1978, and 1981 agreements.

Courts have concluded that the language of the NBCWAs, beginning with the NBCWA of 1974, provided that pensioners would be entitled to health services for life.[4] The 1978 NBCWA, as well as all subsequent NBCWAs required signatory operators to perpetually contribute to the trusts created by those agreements. These provisions, called "evergreen clauses", required each signatory operator to continue making contributions to the trusts at the amount specified in future NBCWAs, regardless of whether the operator signed the future NBCWA.[5]

The funds that provided such benefits became financially unstable in the mid- and late–1980s. As coal operators terminated their participation in the trusts and health care costs escalated, the trusts experienced a financial crisis that threatened their continued existence. This crisis threatened to disrupt coal production and interstate commerce, cripple the economies of several coal-producing states, and deprive over 100,000 retired miners and their dependents of promised health benefits. To remedy the shortfall in funding, Congress enacted the Coal Act of 1992.

The Coal Act consolidated the existing funds and created the UMWA Combined Benefit Fund ("Combined Benefit Fund"). 26 U.S.C. § 9702. The Combined Fund provides health benefits to beneficiaries who, as of July 1992, were receiving benefits from the earlier trusts. *Id.* at § 9702(a).

The Coal Act also created a second fund, the 1992 UMWA Benefit Plan. *Id.* at § 9712. That Plan (whose Trustees are the Plaintiffs in this action) provides health benefits to

Eastern District of Kentucky ("Kentucky lawsuit").

**3.** Pursuant to Local Rule 108(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." The Court thus recites facts from the Parties' Statements of Material Facts Not in Dispute and their Stipulation of Facts.

**4.** *See, e.g., District 29, United Mine Workers of Am. v. United Mine Workers of Am. 1974 Benefit*

*Plan & Trust,* 826 F.2d 280, 283 (4th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *United Mine Workers of Am. by Rabbit v. Nobel,* 720 F.Supp. 1169, 1178 (W.D.Pa.1989), *aff'd without opinion,* 902 F.2d 1558 (3d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991). Robert Coal argues that its retired employees, however, had no rational basis for expecting lifetime health benefits. (Defs.' Mem. Summ. J. at 38.)

**5.** *See, e.g., United Mine Workers of Am. 1974 Pension v. Pittston Co.,* 984 F.2d 469, 471–72 (D.C.Cir.1993), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3040, 125 L.Ed.2d 726 (1993).

people who should receive coverage under an individual employer plan but do not. *Id.* at § 9712(b)(2)(B). Beneficiaries are assigned, or attributed, to the coal mine operator that most recently employed them and was a signatory to the NBCWAs of 1978 or later. 26 U.S.C. § 9706(a)(2). Premium payments for beneficiaries of the 1992 UMWA Benefit Plan are the responsibility of the beneficiaries' most recent signatory employers. *Id.* at § 9712(d).

It is Robert Coal's alleged responsibility for making payments to the 1992 UMWA Benefit Plan that is at issue in the instant action.

## B. The Current Dispute

Defendants Robert Coal and Cliffs Mining Company ("Cliffs Mining") are wholly-owned subsidiaries of Defendant Cleveland–Cliffs, Inc. ("Cleveland–Cliffs"). The three Defendants are "related persons" within the meaning of section 9701(c) of the Coal Act, 26 U.S.C. § 9701(c).[6]

The 1992 Plan has assigned a number of Plan-beneficiaries to Robert Coal. Plaintiffs assert that Defendants are liable to the 1992 Plan for the payment of monthly premiums for each beneficiary who is receiving health benefits from the 1992 Plan and who is "attributable" to Robert Coal under 26 U.S.C. § 9712(d)(3). The Plan seeks to collect premiums for the employees attributable to Robert Coal for the period February 1993 to April 1994.[7]

Defendants' argument centers around the 1988 settlement of the Kentucky lawsuit. Defendants claim that the federal District Court's approval of the settlement agreement, and its subsequent dismissal with prejudice of the lawsuit, constitutes a final judgment. That judgment, Defendants contend, may not be disturbed by obligations imposed by subsequent legislation—here, the 1992 Coal Act. (Defs.' Mem. Summ. J. at 11–16.)

The Court will briefly discuss the Kentucky lawsuit and resulting settlement agreement, as they form the basis of Defendants' Motion in the instant action.

### 1. The Kentucky Lawsuit

Robert Coal managed and supervised the construction and operation of two mines in Pike County, Kentucky, pursuant to management agreements with two coal mining companies. Robert Coal entered into the first agreement with Leslie Coal Mining Co. ("Leslie") in 1974, and the second with McInnes Coal Mining Co. ("McInnes") in 1976. Robert Coal employed all of the workers at the two mines from the dates of the respective management agreements until 1984. Robert Coal's employees during that period included classified workers who were members of and represented by UMWA.

The assets of the two mines were sold in 1984. Shortly thereafter, UMWA alleged that the sales violated the successorship clause of the NBCWAs because they were made without first securing the purchaser's consent that it would assume obligations under the NBCWAs. UMWA subsequently brought suit against several defendants, including Robert Coal, in the United States Court for the Eastern District of Kentucky.

In 1988, UMWA, Cliffs Mining (then known as Pickands Mather & Co. ("PM")), and Robert Coal entered into a settlement agreement in the Kentucky lawsuit. Under the agreement, Robert Coal agreed to provide health and other benefits to a group of its former employees from the Leslie and McInnes mines, and to their surviving spouses and dependents, through January 1993. In return, UMWA released Robert Coal and Cliffs Mining "from any and all claims ... which the Union now has or ever had against the PM Group" arising out of its dealings

---

**6.** As "related persons" within the meaning of the Coal Act, Cliffs Mining and Cleveland–Cliffs will be jointly and severally liable to Plaintiffs if Robert Coal is found to be liable. 26 U.S.C. § 9711(c).

**7.** In their stipulation, the parties note that the uncollected premiums for that period would total $327,346.23. Since the filing of the Complaint, the parties have entered into an Escrow Agreement and Plan, pursuant to which Defendants are paying monthly premiums to an escrow account. The Agreement provides that the escrow payments shall be distributed to the successful party in this litigation. (Defs.' Mot. Dismiss n. 7; *see also* Perry Aff. ¶ 5.)

with the Leslie or McInnes mines. (Stip. Ex. A at 5.)

After approving the agreement, the District Court entered an order dismissing the Kentucky suit with prejudice. (Stip. Ex. B.) No appeal was taken from that dismissal.

Robert Coal provided benefits, as required by the settlement agreement, from May 1988 through January 1993. Thereafter, the 1992 Plan provided health benefits to those persons who had previously received such benefits from Robert Coal.

### 2. Procedural Posture

Plaintiffs bring this action to collect premium payments for which they allege Defendants are jointly and severally liable under the 1992 Plan. Plaintiffs seek declaratory relief, a judgment for $240,542.28, plus interest and liquidated damages as well as attorneys fees and costs.[8] Both Defendants and Plaintiffs have moved for Summary Judgment and Intervenor United States has filed a Memorandum in Opposition to Defendants' Motion.

### II. *Standard of Review*

The Federal Rules of Civil Procedure state that:

> A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(b)–(c). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In the instant case, Plaintiffs, Defendants and Intervenor United States agree that there are no genuine issues as to any material fact. The parties have also submitted a

Stipulation of Facts. The Court thus proceeds to the legal issues before it.

### III. *Analysis*

Defendants argue that the Coal Act was not intended by Congress to apply to signatory operators in Robert Coal's situation. They maintain that the approval of the settlement agreement and subsequent dismissal with prejudice of the Kentucky suit was a final judgment that fully extinguished Robert Coal's obligation to provide retiree health benefits. Finally, application of the Coal Act to Robert Coal, Defendants contend, reopens and disturbs the prior final judgment and thus raises serious constitutional questions. The Court will address each of Defendants' arguments in turn.

### A. Applicability of the Coal Act to Robert Coal

#### 1. Congressional Intent

■ The Coal Act generally makes "[a]ny last signatory operator" liable for the premium payments sought by Plaintiffs in this case. 26 U.S.C. § 9712(d)(3). Robert Coal, as a signatory operator to several NBCWAs, appears to fall within the intended scope of the Act.

Defendants argue, however, that despite its plain language, the Coal Act does *not* apply to Robert Coal. They argue that Congress did not intend to impose new liability on signatory operators whose obligations were extinguished by contractual agreements.

■ In general, courts should give effect to the plain language of a statute. *See, e.g., Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962) (in construing a statute, courts are to presume "that the legislative purpose is expressed by the ordinary meaning of the words used"); *see also, Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention

---

8. Beginning in February 1993, Plaintiffs have assessed against Defendants approximately $20,- 000 per month in premium payments. (Defs.' Mot. Dismiss n. 7; *see also* Perry Aff. ¶ 5.)

to the contrary, [statutory] language must ordinarily be regarded as conclusive").

Defendants argue that the Coal Act does not apply to them because "Congress never considered the possible effect of the Act on an operator in the unique situation presented herein." (Defs.' Mem. Summ. J. at 12.)

■ On questions of statutory interpretation, the Court searches for some clear indication of legislative intent. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 647, 110 S.Ct. 2668, 2676, 110 L.Ed.2d 579 (1990) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). Here, the legislative history cited by Defendants shows only that Congress failed to affirmatively consider their situation. The Court can draw no inference at all regarding the intended or unintended application of the Act to those in Robert Coal's position merely from Congressional silence. *See, e.g., Warner–Lambert Co. v. Federal Trade Comm'n*, 562 F.2d 749, 758 n. 39 (D.C.Cir.1977); *National Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689 (D.C.Cir.1971). To impose such a standard would require Congress, in enacting any legislation, to anticipate the myriad situations in which the legislation could conceivably apply.

Moreover, the legislative history of the Act indicates that Congress understood and intended the Act to require signatory operators, who were no longer legally or contractually obligated to do so, to bear the cost of providing retired coal miners with health benefits. ("[W]ithdrawals of contributing employers from privately maintained benefit plans under collective bargaining agreements ... result in substantially increased funding burdens for employers that continue to contribute to such plans ...") (H.R. Conf. Rep. No. 102–461, at Title VI, § 6002 (1992)). Thus, Congress was well aware that the UMWA Funds' financial difficulties were in large part due to the fact that many signato-

ry companies terminated their contractual health care obligations and dumped their responsibilities onto the UMWA Funds, thus adding to the financial burden of the remaining signatory operators.

For these reasons, the Court is unpersuaded by Robert Coal's contention that Congress implicitly exempted operators in its situation from the requirements imposed by the Act.[9]

### 2. Reopening the Kentucky Lawsuit

■ Defendants argue that application of the Coal Act to Robert Coal unconstitutionally reopens and disturbs a prior final judgment, namely the order entered in the Kentucky lawsuit.

The Kentucky settlement agreement released Robert Coal from any duty to provide further benefits "arising out of any Wage Agreement". (Stip. Ex. A; Settlemt. Agreemt. at 4.) But the settlement agreement did not by its plain terms purport to absolve Robert Coal of all prospective responsibilities which might arise under future legislation such as the Coal Act.

The Defendants misstate the issue—the Coal Act does not reimpose on Robert Coal the same obligation that it already satisfied through the settlement of the Kentucky lawsuit. Instead, the Coal Act creates future statutory liability and imposes a new and separate obligation on Robert Coal.

There is no question that the settlement agreement terminated Robert Coal's *contractual* obligation to contribute to the UMWA 1950 and 1974 Benefit Plans as of January 1993. The Coal Act, however, imposes a *statutory* obligation on Robert Coal to contribute to the new Combined Fund as of February 1993. The fact that the statutory obligations under the Coal Act are similar to or modeled on obligations created by earlier collective bargaining agreements does not mean they are "arising out of" such earlier agreements, as the settlement agreement provides. By Robert Coal's logic, any entity

---

**9.** The language of the Coal Act itself indicates Congress's intent to impose a new statutory obligation on signatory operators without disturbing past contractual obligations. Section 9708 of the Coal Act provides that nothing in the Act is

intended to have any effect on claims or obligations arising in connection with the 1950 or 1974 UMWA Benefit Plans as of February 1, 1993. 26 U.S.C. § 9708.

operating in a highly regulated, national industry would be able to forever insulate itself from future Congressional regulation by settling a contract dispute in federal court.

Defendants rely heavily on the D.C. Circuit Court's opinion in *Daylo v. Administrator of Veterans' Affairs*, 501 F.2d 811 (D.C.Cir.1974), to support their argument that the Coal Act is inapplicable to them. The dispute in *Daylo* centered around a final judgment which was based on a Congressional statute. That statute was later amended. One of the parties advocated a retroactive application of the amended statute to the judgment, which would have nullified that judgment. The *Daylo* court determined that neither the statute's language nor its legislative history evinced Congressional intent to reopen final judgments entered pursuant to passage of the original statute.

*Daylo* resolved two suits involving (1) a single cause of action; (2) involving the same parties; (3) under a single statute. The facts and legal issues in *Daylo* are distinguishable from the instant case. First, the instant case does not involve a single cause of action. Instead, the Kentucky suit involved a contractual dispute, while the current action involves a statutory obligation. Second, here there is no total overlap of parties. The 1993 Benefit Plan is a separate and distinct entity from UMWA. Finally, this action arises under a statute, the 1992 Coal Act, while the Kentucky suit arose under common-law contract principles.

This Court thus finds that application of the Coal Act to Robert Coal does not operate to reopen or disturb the Kentucky suit judgment.

## B. Constitutionality of the Coal Act

### 1. Separation of Powers Challenge

■ Defendants claim that the Coal Act is unconstitutional because it impermissibly directs the reopening of a final judgment of an Article III court in violation of the Separation of Powers Doctrine. Defendants rely on *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), to support their argument.

As discussed, application of the Coal Act to Robert Coal does not disturb the final judgment entered in the Kentucky suit. The Court thus need not address Defendant's argument at great length but will discuss it briefly.

*Plaut*, like *Daylo*, is distinguishable from the instant case in both its facts and the applicable law. In *Plaut*, the Supreme Court invalidated a Congressional enactment that permitted cases already dismissed to be reinstated. The Court found the amendment unconstitutional because, "[h]aving achieved finality . . . a judicial decision becomes the last word of the judicial department *with regard to a particular case or controversy* . . ." *Plaut*, 514 U.S. at 226–27, 115 S.Ct. at 1457 (emphasis added). That amendment, like the statute in *Daylo*, retroactively changed the law which the trial court had applied at the time of its earlier decision.

Defendants argue that the rulings of federal courts in private contractual disputes bar Congress from imposing subsequent regulations that affect those parties. The Supreme Court has addressed this argument and has unambiguously held that "[c]ontracts, however express, cannot fetter the constitutional authority of Congress." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) (quoting *Norman v. Baltimore & Ohio R. Co.*, 294 U.S. 240, 307–08, 55 S.Ct. 407, 415–16, 79 L.Ed. 885); *see also, Fleming v. Rhodes*, 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947).

This Court thus finds that application of the Coal Act to Robert Coal does not violate the Separation of Powers Doctrine.

### 2. Due Process Challenge

■ Defendants assert that the Coal Act violates the Due Process Clause of the Fifth Amendment, which protects persons from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

■ In general, economic legislation satisfies the requirements of due process so long as it is rationally related to a legitimate government purpose. *Regan v. Taxation with Representation*, 461 U.S. 540, 547, 103

S.Ct. 1997, 2001–02, 76 L.Ed.2d 129 (1983); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 83–84, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1978); *Colorado Springs Production Credit Ass'n v. Farm Credit Admin.*, 758 F.Supp. 6, 9 (D.D.C.1991), *aff'd,* 967 F.2d 648 (D.C.Cir. 1992).

■ Statutes that regulate commercial burdens and benefits are accorded a formidable presumption of constitutionality. *See, e.g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

■ The presumption is even weightier when Congress enacts legislation under its Commerce Clause power, for such legislation is entitled to the most deferential level of judicial scrutiny. In this instance, a challenger must show that the legislature acted "in an arbitrary and irrational way." *Id.* A court must uphold the law if there is any rational reason for its enactment; regardless of whether Congress had that particular justification in mind when it enacted the legislation. *See, e.g., FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993).

■ This deferential standard applies even if the enactment readjusts benefits and burdens or "upsets otherwise settled expectations … [or] impose[s] a new duty or liability based on past acts." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). So long as the statute can be supported "by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984).

Many courts have recently considered due process challenges to the Coal Act. These courts have uniformly rejected the challenges. As a recent opinion noted, *"every* federal court that has addressed the substantive due process issue has concluded that the Coal Act does not violate the substantive component of the Fifth Amendment's Due Process Clause." *Bellaire Corp. v. Shalala*, Civ. Act. No. 93–183, slip. op. at 17 (D.D.C. April 21, 1997) (emphasis in original) (citing *Davon, supra,* 75 F.3d at 1127; *Lindsey Coal, supra,* 90 F.3d 688; *In re Blue Diamond Coal Co.*, 79 F.3d 516, 523 (6th Cir. 1996); *Barrick Gold Exploration, Inc. v. Hudson,* 47 F.3d 832 (6th Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995); *In re Chateaugay Corp.*, 53 F.3d 478, 491 (2d Cir.1995), *cert. denied,* 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995)).

■ Enactment of the Coal Act rested on a Congressional determination that "the production, transportation, and use of coal substantially affects interstate and foreign commerce and the national public interest". Pub.L. No. 102–486, § 19142(a)(1), 106 Stat. 2776, 3037 (1992). Congress determined that modification of the private health care benefit plan structure for coal industry retirees was necessary to ensure the stability of interstate commerce. Pub.L. No. 102–486 § 19142(a)(2), 106 Stat. 2776, 3037 (1992).

This Court, like all other courts that have considered the issue, concludes that Congress's stated objective in enacting the Coal Act constitutes a legitimate governmental purpose.

■ The means chosen by Congress to achieve its stated purpose involved identifying those "persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees." Pub.L. No. 102–486 § 19142(a)(2), 106 Stat. 2776, 3037 (1992).

This Court (again, like all other courts that have considered the issue) concludes that Congress's chosen method of achieving its purpose is reasonable and thus survives rational basis review.

Defendants claim that "no rational basis exists for concluding that any expectation by Robert's retirees of receiving lifetime health benefits was Robert's responsibility". (Defs.' Mem. Summ. J. at 38). Several courts have recently rejected this argument, and this Court must do the same.

In *In re Blue Diamond Coal Co., et al. v. Shalala*, 79 F.3d 516 (6th Cir.1996), the coal company argued, as does Robert Coal, that it had created no explicit promises or expectations of lifetime health benefits for its employees. The Court held it irrelevant that the company created no specific expectations in its employees; Congress could still impose Coal Act liability. *Id.* at 522–23. The Court reasoned that, as a signatory to the NBCWAs and contributor to the benefit funds, the company "contributed to a reasonable expectation of lifetime health benefits". *Id.,* (citing *Davon v. Shalala,* 75 F.3d 1114, 1124–25 (7th Cir.1996)).

Defendants, claim that the court's order dismissing with prejudice the Kentucky lawsuit makes their situation unique does not change this outcome. *See Chateaugay,* 53 F.3d 478 (bankruptcy protections did not operate to relieve company of its obligations under the Coal Act); *Bellaire,* slip op. at 13–41 (application of Coal Act to companies that had never employed plaintiff miners did not violate due process); *Templeton Coal Co., Inc. v. Shalala,* 882 F.Supp. 799, 815 (S.D.Ind.1995) (application of Coal Act to company who had previously satisfied its contractual obligation to pay premiums did not violate due process).

Finally, Defendants argue that the Coal Act, as applied to them, violates the so-called "Vested Rights Doctrine". Defendants contend that a final judgment creates an absolute, inviolable right that is immune from Congressional regulation. (Defs.' Mem. Summ. J. at 22–23) (citing *McCullough v. Com. of Virginia,* 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382 (1898).

 "Vested Rights", however, deserve and receive no more protection than other property rights; alleged violations of those rights must also submit to the traditional due process analysis discussed earlier. *See, e.g., Johnston v. Cigna Corp.,* 14 F.3d 486, 490 (10th Cir.1993). As also discussed earlier, the Coal Act easily survives such analysis.

### 3. Takings Clause Challenge

 Defendants contend that any application of the 1992 Coal Act "that serves to annul, nullify or take away the right obtained by Robert through the Final Judgment constitutes an unlawful taking of property in violation of the Fifth Amendment, as applied to Robert". (Defs.' Mem. Summ. J. at 27.)

The Takings Clause prohibits the taking of private property "for public use, without just compensation." U.S. Const. amend. V. The Supreme Court has repeatedly stated that the Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 (1978) (citation omitted).

Courts have decided Takings Clause challenges to the Coal Act in much the same way they decided substantive due process challenges—they have overwhelmingly rejected them and concluded that the Coal Act does not violate the Takings Clause. *See, e.g., Bellaire,* slip. op. at 46 (citing cases that upheld the Coal Act in the face of takings clause challenges, including *Davon, Inc.,* 75 F.3d at 1127; *Lindsey Coal,* 90 F.3d 688; *In re Blue Diamond Coal Co.,* 79 F.3d 516, 523 (6th Cir.1996); *Barrick Gold,* 47 F.3d at 832; and *Chateaugay,* 53 F.3d at 491).

 The Supreme Court has articulated three factors to be used in ascertaining the existence of a compensable taking. These are "(1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations, and (3) the nature of the governmental action." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026 (citing *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). *See also, Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Eastern Enterprises v. Chater,* 110 F.3d 150, 160 (1st Cir.1997) (citing *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 643–44, 113 S.Ct. 2264, 2290–91, 124 L.Ed.2d 539 (1993)).

In determining whether application of the Coal Act to Robert Coal constitutes a com-

pensable taking, the Court turns first to economic impact.

■ Defendants estimate the premiums assessed against Robert Coal at a minimum of $8.6 million.[10] While there may be some dispute as to the exact amount of the premiums, absolute precision on this point is not necessary. The Supreme Court has stated that "[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. at 2291. In the multiemployer benefit plan context, the proper inquiry is whether the employer's liability is proportionate to the employer's experience with the fund at issue. *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026.

■ Here, Robert Coal's liability to the 1992 Plan is based solely on the number of its former employees who are receiving benefits from the Plan. (U.S. Opp'n to Defs.'s Mot. Summ. J. at 35) (citing 26 U.S.C. § 9712(d)(3)). Thus it is clear that Robert Coal's obligations to the Plan are reasonable and directly proportionate to its liability under the previous funds.

■ The second factor to be considered is the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations. Robert Coal claims that it reasonably held an investment-backed expectation that it would be completely free of any future liability for retiree health benefits when it signed the settlement agreement. Since the Coal Act was enacted after Robert Coal entered into the settlement agreement, this issue presents a closer question than did the analysis under the "economic impact" prong of the test. Nevertheless, Robert Coal fails to meet its burden.

First, Robert Coal signed several NBCWAs which required signatory operators to continue making contributions to the Benefit Trusts, regardless of whether the operator did or did not sign any subsequent NBCWA. In *United Mine Workers of Am. v. Nobel*, 720 F.Supp. 1169, 1178 (W.D.Pa. 1989), *aff'd without opinion*, 902 F.2d 1558

(3d Cir.1990). *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991), the Court held that:

> The language of the plan benefits contained in the past five collective bargaining agreements between the UMWA and the BCOA, providing that a pensioner 'will be entitled to a health services card for life,' together with the 25–year history of lifetime benefits prior to 1974, ... establish that the *parties intended to provide health benefits to the individual plaintiffs for life.* We find that the language confers a right to benefits for the lifetime of the pensioner.

(emphasis added). *See also District 29, United Mine Workers of Am. v. United Mine Workers of Am. 1974 Benefit Plan & Trust*, 826 F.2d 280, 283 (4th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). Thus, Robert Coal's participation in the agreements weighs heavily against the "reasonableness" of its alleged investment-backed expectations of being free from all future obligations to provide health benefits.

Second, the Supreme Court has stated that companies who conduct business in historically regulated fields "cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. at 2291. Indeed, courts have repeatedly asserted that government involvement in the coal industry put coal operators on notice that the government might intervene in the management of benefit funds. As the Sixth Circuit noted in *Blue Diamond Coal*, 79 F.3d at 525 (citing *Davon*, 75 F.3d at 1128–29):

> "[T]he federal government pervasively regulates the coal mining industry, the UMWA Fund originated from a federal takeover of the nation's coal mines, and federal intervention has been required to settle strikes over benefits issues. Given these circumstances, Blue Diamond cannot argue that it was reasonable for [it] to believe that Congress would never intervene in the management of the UMWA Fund or its successor funds."

---

**10.** Intervenor United States points out, however, that Defendants have not adjusted their numbers to their present value, making Defendants' figure

an inflated estimate of their obligations to the 1992 Plan. (U.S. Opp. at 35–36 n. 42 (citing Perry Aff. Ex. C).)

The third and final factor to be considered in determining whether the application of the 1992 Coal Act to Robert Coal constitutes an impermissible taking is the nature of the governmental action itself. Courts have much more readily found a taking when the government "physically invade[s] or permanently appropriate[s]" assets for its own use, as opposed to when the deprivation merely "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good." *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026; *accord Keystone Bitum. Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 n. 18, 107 S.Ct. 1232, 1243 n. 18, 94 L.Ed.2d 472 (1987). As stated in *Chater*, "[t]o present this dichotomy is to resolve it. The Coal Act ... *is* merely a public program that readjusts economic burdens, and the funds collected are paid to a private benefit fund, not to a government entity." *Chater*, 110 F.3d at 161.

▮ Finally, the Supreme Court's decision in *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), where it decided the constitutionality of certain provisions of the Multiemployer Pension Plan Amendments Act of 1980[11] ("MPPAA"), is instructive. Like the Coal Act, the MPPAA was enacted to protect participants in multiemployer benefit plans. Among its provisions is a requirement that an employer withdrawing from a multiemployer pension plan pay a fixed amount to that plan. Trustees who administered a multiemployer pension plan under a collective bargaining agreement contested the constitutionality of those withdrawal liability provisions. The trustees argued that the provisions imposed a new obligation on employers and plan participants that exceeded the obligations imposed by earlier contractual agreements: According to the trustees, the new statutory obligation destroyed the existing contractual rights and thus constituted an unconstitutional taking.

The *Connolly* Court upheld the MPPAA, even though the Act explicitly nullified the previous contractual provisions limiting em-ployers' liability and imposed an additional statutory obligation on employers. The Court held that the MPPAA did not violate the Takings Clause of the Fifth Amendment, stating that "the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose." *Id.* at 224, 106 S.Ct. at 1025–26.

The Court's decision in this case is not as far-reaching as the Supreme Court's decision in *Connolly*. As discussed above, the Coal Act does *not* nullify the contractual agreement between Robert Coal and UMWA. It does, however, impose "an additional [statutory] obligation that is otherwise within the power of Congress to impose." *Id.*

This Court thus finds that the Coal Act, like the MPPAA, works no unconstitutional Taking.

### 4. Appointments Clause Challenge

▮ Defendants claim that the 1992 Coal Act violates the Appointments Clause of the Constitution, which states in relevant part that, "[The President,] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... all Officers of the United States ..." U.S. Const. Art. II, § 2, cl. 2.

▮ The Court finds Defendants' argument to be without merit. The definition of an "officer" requires (1) a continuing and formalized relationship of employment with the United States government; and (2) the exercise of significant authority. *See Buckley v. Valeo*, 424 U.S. 1, 125–26, 96 S.Ct. 612, 685–86, 46 L.Ed.2d 659 (1976).

▮ The Trustees of the 1992 Plan are not "officers" under the *Buckley* standard. First, they hold no "office" or continuing employment relationship with the United States government; the Plan acts as a private entity. (U.S. Opp'n to Defs.' Mot. Summ. J. at 42) (citing Defs.' Mot. Summ. J. at 40–51). Not only are the Trustees of the Plan and the UMWA private parties, but the

---

11. Employee Retirement Income Security Act of 1974, §§ 4201–4303, as amended, 29 U.S.C.A. §§ 1381–1453.

Coal Act itself expressly provides that the 1992 Plan is a "private plan". 26 U.S.C. § 9712(a)(1). The 1992 Plan operates like any other private multiemployer benefit plan, differing only in that the obligation imposed on signatory operators to contribute stems from a statutory as opposed to contractual obligation. The 1992 Plan and its Trustees act only to further the private interests of the Plan beneficiaries, not the public interest or the federal government.

Second, while it is true as Defendants argue, that the Trustees do exercise "significant authority", what is relevant is that they do not exercise significant *governmental* authority. The Trustees exercise no governmental authority of any kind. Instead, they are charged with operating a private multiemployer plan. The Trustees exercise their authority to serve only the interests of the Plan beneficiaries, not the federal government or even the public-at-large. *See, e.g., Melcher v. Federal Open Market Committee,* 644 F.Supp. 510, 521 (D.D.C.1986) (selection of members of Federal Reserve Board's federal open market committee by private individuals did not violate Appointments Clause), *aff'd in part and vacated in part on other grounds,* 836 F.2d 561 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2034, 100 L.Ed.2d 619 (1988).

Since the Trustees of the 1992 Plan possess none of the attributes of "officers" pursuant to the Appointments Clause, this Court holds that they need not be appointed in conformity with the requirements of that Clause.

### C. Credit for Robert Coal's Payments under Kentucky Settlement Agreement

In its Answer to Plaintiff's Complaint, Defendants assert that Robert Coal should receive a "credit or set off for the costs that it voluntarily assumed and paid in providing health and other benefits from May of 1988 through ... January 31, 1993". (Defs.' Answer ¶ 52.) As discussed above, Robert Coal's payments pursuant to the Kentucky agreement stemmed from a contractual obligation. That obligation is separate and distinct from the statutory obligation imposed

upon Robert Coal by the Coal Act. The Court thus rejects Robert Coal's argument and finds that a set off is not warranted in this case.

### IV. *Conclusion*

For the reasons discussed above, Defendants' Motion for Summary Judgment [# 38] is hereby **denied**, and Plaintiffs' Motion for Summary Judgment [# 36] is hereby **granted**.